# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>TRAVIS WAYNE MATTSON, a/k/a Banana,<br><br>        Defendant. | No. 5:18-CR-04043-LTS<br><br>**REPORT AND RECOMMENDATION** |

_____

Defendant Travis Wayne Mattson moves to suppress evidence seized pursuant to a warrant for his residence, arguing that the warrant was defective since it listed the wrong apartment number for his residence. Docs. 17, 17-1. He also cursorily argues that the warrant to search his residence lacked probable cause. Doc. 17-1. The United States (the Government) resists. Doc. 22.

I conducted a hearing on the motion on August 6, 2018. Docs. 30-32. The Government presented testimony from Officer Leigh Winterboer of the Spencer, Iowa, Police Department; Deputy John Davenport and Lieutenant Casey Timmer of the Clay County, Iowa, Sherriff's Office; and Special Agent Nathan Ewalt of the Iowa Division of Narcotics Enforcement. Doc. 30. I also admitted exhibits submitted by both parties. Doc. 30; *see* Docs. 25 to 25-1 (Government's exhibits 11 and 12), Docs. 26-1 to 26-6 (Mattson's exhibits A101 to A106), Docs. 27-1 to 27-23 (Government's exhibits 13a to 13w), Docs. 28 to 28-9 (Government's exhibits 1-10).[1] In lieu of oral argument, the parties submitted written argument on August 20, 2018. Docs. 30, 34, 35, 36. After

---

[1] The Government refiled its exhibits 1 through 10 because the exhibits previously filed (at Docs. 23 to 23-9) were not marked.

1

considering the evidence and arguments, I recommend **denying** the motion to suppress (Doc. 17).

## I. BACKGROUND[2]

On May 9, 2018, at 9:57 p.m., the Clay County Sheriff's Office received a 911 call reporting gunshots fired at the Country Villa trailer park, located near the intersection of 365th and 240th Avenues in rural Spencer, Iowa. A second emergency call was received from Nicholas VandeVegte, who reported a drive-by shooting of his trailer. Nicholas[3] told officers sent to investigate that he had been working on a vehicle in his driveway when he heard four gunshots fired at his trailer. He waited until the shooting ceased before looking and observing a vehicle speeding away from his trailer heading westbound on 365th Avenue. He believed the vehicle was a Cadillac due to its taillights. In a subsequent interview two days after the shooting, Nicholas elaborated that he is familiar with cars and that he believed the taillights belonged to a Cadillac because they were long and narrow LED lights. He also stated that about a week prior to the shooting, he had observed a white Cadillac stopped on the gravel road near his residence in the middle of the afternoon, which he had found strange.

Investigating the scene the night of the shooting, officers confirmed that the VandeVegte trailer had been struck by four rounds. Officers recovered two bullets from the exterior of the trailer, and three nine millimeter shell casings from the roadway and officers knew that a federal defendant had previously proffered in April 2018 that Mattson possessed multiple firearms, including a nine millimeter handgun. Officers also spoke to

---

[2] Unless noted otherwise, the relevant facts contained in this section come from the search warrants and supporting documents (Docs. 28-3, 28-4) and the testimony presented during the suppression hearing.

[3] Christina VandeVegte also plays a role in the relevant facts, and I refer to both VandeVegtes by their first name to avoid confusion.

two people at the trailer park who had observed a Cadillac with LED lights traveling southbound on 240th Avenue before turning right and heading west on 365th Avenue. One of the witnesses said the LED lights were white or blue with a new LED strip or ribbon. Officers recovered surveillance footage from a gas station located within two to three miles of the trailer park, showing a white Cadillac traveling southbound on Grand Avenue at 9:49 p.m. (a direct route one could take from town—or Mattson's residence—to the trailer park) and northbound on Grand Avenue at 9:57 p.m. (toward town and away from the trailer park). Officers also recovered surveillance footage from a gas station on the other side of town, which showed what they believed to be the same Cadillac traveling northbound on Grand Avenue at 9:58 p.m. (away from town and the trailer park). The footage from the second gas station clearly depicted the Cadillac's dark roof and aftermarket LED light bar installed on the edge of the roof. Officers knew this distinctive Cadillac to be the vehicle commonly driven by Mattson.[4] The morning after the shooting, officers observed the Cadillac parked at the four-apartment townhouse known to be where Mattson resided.

The night of the shooting, Nicholas told officers that he had recently evicted Jennifer Cowell. Officers spoke with Cowell by phone two days after the shooting. She denied having any direct knowledge of the shooting, but she stated that after speaking with Mattson and Christina VandeVegte (Nicholas' wife), it was her understanding that the shooting was a result of Christina owing Mattson $300. Officers had previously learned from Cowell in February 2018 that Christina distributed methamphetamine supplied by Mattson and that she frequented Mattson's residence to acquire

---

[4] The white Cadillac driven by Mattson is registered to Christina VandeVegte. She informed law enforcement during an interview two days after the shooting that the Cadillac "was registered in her name in order to evade law enforcement because she has a clean record." Doc. 28-3 at 7. Contrary to Mattson's arguments at the hearing, this fact is included in the affidavit in support of the warrant, and the registration information for the Cadillac is included as the sixth attachment to the warrant application. Doc. 28-3 at 7, 25.

3

methamphetamine. Officers had observed vehicles known to be operated by Christina parked near Mattson's residence numerous times since then, including on the day of the shooting.

Officers then interviewed Christina. She stated she had previously borrowed $200 from Mattson and that a week ago, Mattson had asked her to repay $100. When she responded that she could bring him the money the next day, but not that night, he blocked her on Facebook. Christina stated that the day after the shooting, she texted Mattson about the shooting and asked whether he had been to her house. He responded that his car was out of gas and had not moved for the past three days. Christina further relayed that she had introduced Mattson to her methamphetamine source in Fort Dodge, Iowa, in April 2018, and that Mattson had purchased methamphetamine directly from that source. Christina said that Mattson did not currently have any methamphetamine and that he was upset about issues with the source. Christina also said that Mattson has surveillance cameras outside his residence that he can monitor from his cell phone. The information about surveillance cameras from Christina matched information provided by a federal defendant during an April 2018 proffer interview, and Lieutenant Timmer also personally observed surveillance cameras outside Mattson's residence.

Based on the above information, Lieutenant Timmer decided to apply for a search warrant for the Cadillac (which he believed could contain the fourth shell casing) and Mattson's person and residence (which he believed could contain firearms, ammunition, cell phones, or surveillance footage to link Mattson to the shooting). The application requested to search "the residence located at 215 W 2nd St. Apt. #2 located on the second floor" of a "blue two story four unit apartment house" in Spencer, Iowa. Doc. 28-3 at 2. The application contained a mistake: Mattson's apartment is #4, not #2 (the address and description of Mattson's residence was otherwise correct). This mistake ultimately translated to the search warrant, which authorized the search of #2, using the same description as contained in the application. Doc. 28-3 at 1. The affidavit in support of

4

the search warrant contained both the correct and incorrect address: it concluded with a request to search #2 (the wrong apartment), but when it described Lieutenant Timmer seeing the white Cadillac parked at Mattson's apartment building the day after the shooting, it noted that "[a]t the time of his last arrest in Clay County in 2016, Mattson provided 215 W 2nd St. Apt #4 as his address" (the correct address). Doc. 28-3 at 5, 9. The 2016 arrest cover sheet containing Mattson's correct address was included as Attachment 3 to the warrant application. Doc. 28-3 at 14. Lieutenant Timmer testified that he prepared the affidavit in support of the search warrant first, and it seems likely that he made an error copying the address the second time he used it in the affidavit, and this erroneous address was then copied into the application and ultimately the search warrant. Mattson has never had any connection to apartment #2, which is a first floor apartment.

Due to concerns about Mattson's dangerousness, a briefing was held prior to the execution of the search warrant to discuss officer safety and operational details. Lieutenant Timmer, Deputy Davenport, Officer Winterboer, and Special Agent Ewalt were all present at the briefing, as well as the leader and members of the tactical entry team. Mattson's correct address and apartment number (#4) were written on the white board at the briefing, which had been copied from his prior arrest record, rather than from the search warrant. *See* Doc. 28-8. Deputy Davenport and Officer Winterboer both had personal knowledge[5] of the layout of Mattson's apartment building and described

---

[5] Deputy Davenport was dispatched to Mattson's apartment building in September 2016 because a man was on the roof. After the man said that he had gotten on the roof through a window in Mattson's apartment, Deputy Davenport entered the building and knocked on the door to apartment #4. After receiving no answer, he ultimately gained access to the roof through a window in apartment #3. Officer Winterboer entered Mattson's apartment during the summer of 2017 after being dispatched to investigate a domestic dispute involving third parties and being let in by Mattson. Officer Winterboer and Special Agent Ewalt had also been involved in controlled buys from Mattson (three for Officer Winterboer, one for Special Agent Ewalt), during which time the officers had observed either Mattson exiting or the confidential informant

5

it during the briefing: Mattson's apartment was located on the second floor, which could only be accessed by an entrance and staircase on the north side of the building (apartment #2 is accessed through an entrance on the south side of the building). Once on the second floor, Mattson's apartment (#4) was to the left, and another apartment (#3) was to the right. That Mattson's apartment was on the second floor and that it could be accessed by only one stairwell were focal points of the briefing, as this layout created concerns of a shoot-out in the stairwell and resulting difficulties evacuating any injured officers or the residents of apartment #3.

During the briefing, it was ultimately decided to wait to execute the search warrant until after Mattson had left his residence. Once Mattson left his apartment, a group of officers followed Mattson to arrest him, while a special tactical entry team gained access to his apartment (#4). The tactical team performed an initial protective sweep of the apartment, and another group of officers (including Deputy Davenport) performed a secondary sweep. During this secondary sweep, Deputy Davenport observed evidence of drug use on the coffee table—namely, a spoon and cotton balls with residue, which was indicative of intravenous drug use, and a marijuana pipe. Officers decided to stop the execution of the search warrant until a second warrant authorizing the search for and seizure of drug evidence could be obtained. Lieutenant Timmer drafted a second warrant for drug-related evidence based on the drug paraphernalia seen in plain view at Mattson's residence. Doc. 28-5. While Lieutenant Timmer was meeting with a state court judge to sign the warrant, an officer discovered that the original warrant used the wrong apartment number. Special Agent Ewalt contacted Lieutenant Timmer to inform him of the mix-up, and the judge changed the apartment number in the second warrant by hand from #2 to #4 prior to signing. The judge also instructed Lieutenant Timmer to add a sentence to the affidavit in support of the second warrant about the apartment number.

---

entering the entrance on the north side of Mattson's apartment building, which leads to apartment #4 and not apartment #2.

After obtaining the second warrant, Mattson's residence was searched, resulting in the seizure of firearms and methamphetamine.

## II. DISCUSSION

Mattson argues that the evidence seized from his residence must be suppressed because the first search warrant listed the wrong apartment number for his residence. He also argues (in one sentence) that the warrant contained insufficient probable cause.

### A. Particularity

"To satisfy the particularly requirement" of the Fourth Amendment, "the place to be searched must be 'described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort' and to avoid mistakenly searching the wrong premises." *United States v. Thomas*, 263 F.3d 805, 807 (8th Cir. 2001) (quoting *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979)). "Mere technical errors in particularity are not enough to invalidate a search warrant." *United States v. Valentine*, 984 F.2d 906, 909 (8th Cir. 1993). "[W]arrants have been upheld 'where one part of the description of the premises to be searched is inaccurate, but the description has other parts which identify the place to be searched with particularity.'" *United States v. Palega*, 556 F.3d 709, 713 (8th Cir. 2009) (quoting *Gitcho*, 601 F.2d at 371). Even when a warrant contains inaccurate information affecting particularity, suppression is not appropriate if the officers relied in good faith on the warrant. In evaluating whether the good-faith exception applies, the Eighth Circuit has found relevant that the description in the warrant "describes a place not in existence[,] . . . that the premises which were intended to be searched had previously been surveilled or were being surveilled while the warrant was obtained," that "the agents executing the warrant personally knew which premises were to be searched," and that the premises "which were intended to be searched were, in fact, those actually searched." *Gitcho*, 601 F.2d at 371-72.

7

Mattson relies on *Thomas*, but in that case, the Eighth Circuit upheld the search under the good-faith exception.[6] 263 F.3d at 808-09. In that case, the warrant listed the wrong apartment number and the wrong street number. *Id.* at 807. The defendant had previously lived at the address listed in the warrant, but the officer who prepared the warrant forgot to update the address, despite conducting surveillance at the defendant's new residence and despite listing the correct address in the affidavit. *Id.* at 806-07. In upholding the search under the good-faith exception, the Eighth Circuit noted that although the warrant described a real place, the danger of that location being searched "was mitigated . . . by the fact that" the officer who "both obtained and executed the warrant" had personal knowledge of the location to be searched and "that the intended location was under surveillance while he secured the warrant." *Id.* at 809.

Here, the first warrant authorized the search of "215 W 2nd St Apt #2 located on the second floor of the building." Ex. 28-3 at 1. Mattson resides at that street address on the second floor, but his apartment is #4, not #2. Even if this mistake is sufficient to invalidate the warrant, the good-faith exception saves the search. Although Mattson took issue at the hearing with the mistake in the warrant being described as a "clerical error," I find that this term accurately describes what happened here. Apartment #2 exists, but it does not exist as described in the warrant, as it is a first-floor apartment. Moreover, the officers executing the warrant knew that the apartment to be searched was #4, on the second floor and to the left of the stairs; although the officers that breached the door to Mattson's apartment had never been there before, prior to the execution of the warrant, they had been to a briefing in which #4 was written on the white board, and officers with personal knowledge described how to access Mattson's apartment. Officers never

---

[6] Mattson also argued at the hearing that the facts here are similar to *United States v. Ross*, but in that case, I also found that the good-faith exception applied. No. 17-CR-4071-LTS-1, 2018 WL 3091623, at *7 (N.D. Iowa Apr. 11, 2018), *report and recommendation adopted by* 2018 WL 1911344 (N.D. Iowa Apr. 23, 2018).

8

searched or attempted to search apartment #2. Thus, "the probability of a mistaken search[] is strongly negated here." *United States v. McCain*, 677 F.2d 657, 661 (8th Cir. 1982). I recommend upholding the search despite the incorrect apartment number listed in the warrant. *See United States v. Clement*, 747 F.2d 460, 461 (8th Cir. 1984) (upholding search pursuant to a warrant authorizing the search of a particular person's apartment but listing the wrong apartment number, because the officer who executed the warrant had personal knowledge of the location of the apartment and went straight to the correct apartment when executing the warrant).

### B. Probable Cause

Under the heading "Sufficient Probable Cause Did Not Exist for the Issuance of a Warrant," Mattson argues that "[t]he information relating to the alleged motive of Mr. Mattson and the description, and lack of a description, of the vehicle sought to be searched, fail to present probable cause." Doc. 17-1 at 8-9. That is the extent of Mattson's briefing on this point.

In accordance with "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *accord United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009). Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence." *United States v. Faulkner*, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, [the

9

Eighth Circuit] has also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).

The affidavit in support of the first warrant provides a substantial basis for probable cause to search Mattson's vehicle. The affidavit sets forth facts connecting Mattson to a drive-by shooting using the white Cadillac. The affidavit provides information that Mattson drives the white Cadillac on a regular basis, despite it being registered to Christina. And the warrant itself describes the Cadillac by color and license plate number. The affidavit in support of the first warrant suggests that Mattson's motive for the shooting related to Christina's failure to repay money she had borrowed. In addition to this information, the affidavit contains many other facts connecting Mattson to the drive-by shooting (as outlined in the background section). Probable cause existed to support the issuance of the first warrant.

### III.   CONCLUSION

I RESPECTFULLY RECOMMEND that Mattson's motion to suppress (Doc. 17) be **denied**.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within **14 days** of the service of a copy of this Report and Recommendation; any response to the objections must be filed within **7 days** after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives

the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DATED** this 7th day of September, 2018.

*[signature: Kelly KE Mahoney]*
Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa