# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> TRAVIS WAYNE MATTSON, a/k/a Banana, <br><br> Defendant. | No. CR18-4043-LTS <br><br> **ORDER** |

This matter is before me on a Report and Recommendation (R&R) (Doc. No. 38) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 17) to suppress. Defendant Travis Wayne Mattson (Mattson) filed timely objections (Doc. No. 41) on September 21, 2018, and the Government filed a resistance (Doc. No. 42) on September 23, 2018.

## I.  BACKGROUND

### A.  *Procedural History*

On May 24, 2018, the grand jury returned an indictment (Doc. No. 2) charging Mattson with one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846, one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), one count of possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) and one count of possession of firearms by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On July 24, 2018, Mattson filed a motion (Doc. No. 17) to suppress. The Government filed a resistance (Doc. No. 22) on

July 27, 2018. Judge Mahoney held a hearing on August 6, 2018. *See* Doc. No. 30. At the hearing, the Government presented testimony from four law enforcement officers. *Id.* Judge Mahoney admitted Government Exhibits 1 through 12 and 13a through 13w, along with defense Exhibits A101 through A106. *Id.* Following the hearing, the parties submitted written arguments. *See* Doc. Nos. 34, 35, 36.

Judge Mahoney issued her R&R (Doc. No. 38) on September 7, 2018. Trial is scheduled to begin November 5, 2018. *See* Doc. No. 40.

B.  *Relevant Facts*

Judge Mahoney summarized the following relevant facts based on the exhibits and testimony presented during the suppression hearing:

> On May 9, 2018, at 9:57 p.m., the Clay County Sheriff's Office received a 911 call reporting gunshots fired at the Country Villa trailer park, located near the intersection of 365th and 240th Avenues in rural Spencer, Iowa. A second emergency call was received from a Nicholas VandeVegte, who reported a drive-by shooting of his trailer. Nicholas told officers sent to investigate that he had been working on a vehicle in his driveway when he heard four gunshots fired at his trailer. He waited until the shooting ceased before looking and observing a vehicle speeding away from his trailer heading westbound on 365th Avenue. He believed the vehicle was a Cadillac due to its taillights. In a subsequent interview two days after the shooting, Nicholas elaborated that he is familiar with cars and that he believed the taillights belonged to a Cadillac because they were long and narrow LED lights. He also stated that about a week prior to the shooting, he had observed a white Cadillac stopped on the gravel road near his residence in the middle of the afternoon, which he had found strange.
>
> Investigating the scene the night of the shooting, officers confirmed that the VandeVegte trailer had been struck by four rounds. Officers recovered two bullets from the exterior of the trailer, and three nine millimeter shell casings from the roadway and officers knew that a federal defendant had previously proffered in April 2018 that Mattson possessed multiple firearms, including a nine millimeter handgun. Officers also spoke to two people at the trailer park who had observed a Cadillac with LED lights traveling southbound on 240th Avenue before turning right and heading west on 365th Avenue. One of the witnesses said the LED lights

2

were white or blue with a new LED strip or ribbon.  Officers recovered surveillance footage from a gas station located within two or three miles of the trailer park, showing a white Cadillac traveling southbound on Grand Avenue at 9:49 p.m. (a direct route one could take from town – or Mattson's residence – to the trailer park) and northbound on Grand Avenue at 9:57 p.m. (toward town and away from the trailer park).  Officers also recovered surveillance footage from a gas station on the other side of town, which showed what they believed to be the same Cadillac traveling northbound on Grand Avenue at 9:58 p.m. (away from town and the trailer park).  The footage from the second gas station clearly depicted the Cadillac's dark roof and aftermarket LED light bar installed on the edge of the roof.  Officers knew this distinctive Cadillac to be the vehicle commonly driven by Mattson.  The morning after the shooting, officers observed the Cadillac parked at the four-apartment townhouse known to be where Mattson resided.

The night of the shooting, Nicholas told officers that he had recently evicted Jennifer Cowell.  Officers spoke with Cowell by phone two days after the shooting.  She denied having any direct knowledge of the shooting, but she stated that after speaking with Mattson and Christina VandeVegte (Nicholas' wife), it was her understanding that the shooting was a result of Christina owing Mattson $300.  Officers had previously learned from Cowell in February 2018 that Christina distributed methamphetamine supplied by Mattson and that she frequented Mattson's residence to acquire methamphetamine.  Officers had observed vehicles known to be operated by Christina parked near Mattson's residence numerous times since then including on the day of the shooting.

Officers then interviewed Christina.  She stated she had previously borrowed $200 from Mattson and that a week ago, Mattson had asked her to repay $100.  When she responded that she could bring him the money the next day, but not that night, he blocked her on Facebook.  Christina stated that the day after the shooting, she texted Mattson about the shooting and asked whether he had been to her house.  He responded that his car was out of gas and had not moved for the past three days. Christina further relayed that she had introduced Mattson to her methamphetamine source in Fort Dodge, Iowa, in April 2018, and that Mattson had purchased methamphetamine directly from that source.  Christina said that Mattson did not currently have any methamphetamine and that he was upset about issues with the source.  Christina also said that Mattson has surveillance cameras outside his residence that he can monitor from his cell phone.  The

3

information about surveillance cameras from Christina matched information provided by a federal defendant during an April 2018 proffer interview, and Lieutenant Timmer also personally observed surveillance cameras outside Mattson's residence.

Based on the above information, Lieutenant Timmer decided to apply for a search warrant for the Cadillac (which he believed could contain the fourth shell casing) and Mattson's person and residence (which he believed could contain firearms, ammunition, cell phones, or surveillance footage to link Mattson to the shooting). The application requested to search "the residence located at 215 W 2nd St. Apt. #2 located on the second floor" of a "blue two story four unit apartment house" in Spencer, Iowa. Doc. 28-3 at 2. The application contained a mistake: Mattson's apartment is #4, not #2 (the address and description of Mattson's residence was otherwise correct). This mistake ultimately translated to the search warrant, which authorized the search of #2, using the same description as contained in the application. Doc. 28-3 at 1. The affidavit in support of the search warrant contained both the correct and incorrect address: it concluded with a request to search #2 (the wrong apartment), but when it described Lieutenant Timmer seeing the white Cadillac parked at Mattson's apartment building the day after the shooting, it noted that "[a]t the time of his last arrest in Clay County in 2016, Mattson provided 215 W 2nd St. Apt #4 as his address" (the correct address). Doc. 28-3 at 5, 9. The 2016 arrest cover sheet containing Mattson's correct address was included as Attachment 3 to the warrant application. Doc. 28-3 at 14. Lieutenant Timmer testified that he prepared the affidavit in support of the search warrant first, and it seems likely that he made an error copying the address the second time he used it in the affidavit, and this erroneous address was then copied into the application and ultimately the search warrant. Mattson has never had any connection to apartment #2, which is a first floor apartment.

Due to concerns about Mattson's dangerousness, a briefing was held prior to the execution of the search warrant to discuss officer safety and operational details. Lieutenant Timmer, Deputy Davenport, Officer Winterboer, and Special Agent Ewalt were all present at the briefing, as well as the leader and members of the tactical entry team. Mattson's correct address and apartment number (#4) were written on the white board at the briefing, which had been copied from his prior arrest record, rather than from the search warrant. *See* Doc. 28-8. Deputy Davenport and Officer Winterboer both had personal knowledge of the layout of Mattson's apartment building and described it during the briefing: Mattson's

apartment was located on the second floor, which could only be accessed by an entrance and staircase on the north side of the building (apartment #2 is accessed through an entrance on the south side of the building). Once on the second floor, Mattson's apartment (#4) was to the left, and another apartment (#3) was to the right. That Mattson's apartment was on the second floor and that it could be accessed by only one stairwell were focal points of the briefing, as this layout created concerns of a shoot-out in the stairwell and resulting difficulties evacuating any injured officers or the residents of apartment #3.

During the briefing, it was ultimately decided to wait to execute the search warrant until after Mattson had left his residence. Once Mattson left his apartment, a group of officers followed Mattson to arrest him, while a special tactical entry team gained access to his apartment (#4). The tactical team performed an initial protective sweep of the apartment, and another group of officers (including Deputy Davenport) performed a secondary sweep. During this secondary sweep, Deputy Davenport observed evidence of drug use on the coffee table – namely, a spoon and cotton balls with residue, which was indicative of intravenous drug use, and a marijuana pipe. Officers decided to stop the execution of the search warrant until a second warrant authorizing the search for and seizure of drug evidence could be obtained. Lieutenant Timmer drafted a second warrant for drug-related evidence based on the drug paraphernalia seen in plain view at Mattson's residence. Doc 28-5. While Lieutenant Timmer was meeting with a state court judge to sign the warrant, an officer discovered that the original warrant used the wrong apartment number. Special Agent Ewalt contacted Lieutenant Timmer to inform him of the mix-up, and the judge changed the apartment number in the second warrant by hand from #2 to #4 prior to signing. The judge also instructed Lieutenant Timmer to add a sentence to the affidavit in support of the second warrant about the apartment number.

After obtaining the second warrant, Mattson's residence was searched, resulting in the seizure of firearms and methamphetamine.

Doc. No. 38 at 2-7 (footnotes omitted).

## II. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## III. DISCUSSION

Mattson makes the following objections to the R&R:

A. The court erred in finding that probable cause existed to support the issuance of the search warrant

B. The court erred in finding that the warrant issued for 215 W 2nd St. Apt. #2 particularly described the place that was actually breached and searched (215 W 2nd St. Apt. #4)

C. The court erred in holding that the good faith exception applies

D. The court erred in applying *United States v. Thomas*, 256 F.3d 805 (8th Cir. 2001) and *United States v. Clement*, 747 F.2d 460 (8th Cir. 1984) because:

- Mattson has never lived in apartment #2;

- the execution of the warrant and the actual breach of the door to apartment #4 was not conducted by the officer who authored the warrant application. The "HEAT team" (none of the members of which were identified by the Government at the hearing) breached the door and entered;

- the affidavit was not incorporated into the warrant;

- the address in the warrant, although incorrect, did not describe the same piece of property;

- the premises intended to be searched was not adjacent to the premises described and both premises were not under control of Mr. Mattson;

- any surveillance was not conducted by an officer who executed the warrant and, in any event, the surveillance was done from the outside of the complex and there were two apartments in the upstairs.

*See* Doc. No. 41. I will address the probable cause argument first, followed by the remaining arguments, as they all relate to the particularity requirement for warrants and application of the good cause exception.

### A. *Probable Cause to Support the Search Warrant*

Mattson fails to explain why he believes Judge Mahoney erred in concluding the search warrant was supported by probable cause. *See* Doc. No. 41 at 1. His initial brief also contained a one-sentence argument on this point. After discussing the applicable law, Judge Mahoney stated:

> The affidavit in support of the first warrant provides a substantial basis for probable cause to search Mattson's vehicle. The affidavit sets forth facts connecting Mattson to a drive-by shooting using the white Cadillac. The affidavit provides information that Mattson drives the white Cadillac on a regular basis despite it being registered to Christina. And the warrant itself describes the Cadillac by color and license plate number. The affidavit in support of the first warrant suggests that Mattson's motive for the shooting related to Christina's failure to repay money she had borrowed. In addition to this information, the affidavit contains many other facts connecting Mattson to the drive-by shooting (as outlined in the background section). Probable cause existed to support the issuance of the first warrant.

Doc. No. 38 at 10. After reviewing the search warrant, the documents submitted in support of the search warrant and the relevant case law, I agree with Judge Mahoney's analysis. Because Mattson does not specify what aspect of Judge Mahoney's analysis he disagrees with, I cannot address it.

To the extent his objection is based on the mistaken apartment number, I find that this factor does not destroy probable cause. "Probable cause exists if the warrant application and affidavit describe circumstances showing a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montes-Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009) (internal quotation marks omitted). Probable cause is based on the totality of the circumstances. *United States v. Hart*, 544 F.3d 911, 914 (8th Cir. 2008). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant . . . ." *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (quoting *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007)). As Judge Mahoney noted, several circumstances connected the shooting to the white Cadillac with distinctive

LED lights. These included Nicholas VandeVegte's observations of the vehicle leaving the area and its presence near his residence earlier in the week. It also included video surveillance showing a white Cadillac traveling in directions and times consistent with the time and place of the shooting. Officers observed the Cadillac parked at Mattson's apartment the day after the shooting. They also interviewed Cowell, who described a conflict between Mattson and Christina VandeVegte, in which Christina allegedly owed Mattson money. Officers observed vehicles owned by Christina parked near Mattson's residence since the day of the shooting. Officers then interviewed Christina, who confirmed that she and Mattson had a money dispute and he was also upset about a methamphetamine source that Christina had introduced him too. Finally, she described surveillance equipment outside of Mattson's residence. This information was corroborated by recent proffer information from a federal defendant and Timmer's own observations. Based on the totality of the circumstances, I find that Timmer's search warrant for the Cadillac, Mattson's person and residence for evidence related to the shooting was supported by probable cause, despite the mistaken apartment number. This objection is overruled.

### B. *Particularity and the Good Faith Exception*

Judge Mahoney concluded that even if the warrant lacked the required particularity, the search was still valid under the good faith exception. Mattson argues evidence from his residence should be suppressed because the initial search warrant listed the wrong apartment number. *See* Doc. No. 23-3 at 1. He also disagrees that the good faith exception should apply (without stating why) and attempts to distinguish the circumstances of this case from those in *Thomas* and *Clement*.

The affidavit in support of the search warrant provided the correct apartment number (4), in one place and the incorrect number (2) in another. *See* Doc. No. 23-3 at 5, 9. The application and search warrant both contained the incorrect number (2). Judge Mahoney summarized Eighth Circuit law on this issue, including case law holding that a

mistake in a warrant describing the premises to be searched does not invalidate the warrant if the officers otherwise relied in good faith on the warrant. *See United States v. Gitcho*, 601 F.2d 369, 371-72 (8th Cir. 1979); *United States v. Thomas*, 263 F.3d 805, 807 (8th Cir. 2001). She analyzed the issue as follows:

> Here, the first warrant authorized the search of "215 W 2nd St. Apt #2 located on the second floor of the building." Ex. 28-3 at 1. Mattson resides at that street address on the second floor, but his apartment is #4, not #2. Even if this mistake is sufficient to invalidate the warrant, the good-faith exception saves the search. Although Mattson took issue at the hearing with the mistake in the warrant being described as a "clerical error," I find that this term accurately describes what happened here. Apartment #2 exists, but it does not exist as described in the warrant, as it is a first-floor apartment. Moreover, the officers executing the warrant knew that the apartment to be searched was #4, on the second floor and to the left of the stairs; although the officers that breached the door to Mattson's apartment had never been there before, prior to the execution of the warrant, they had been to a briefing in which #4 was written on the white board, and officers with personal knowledge described how to access Mattson's apartment. Officers never searched or attempted to search apartment #2. Thus, 'the probability of a mistaken search[] is strongly negated here.' *United States v. McCain*, 677 F.2d 657, 661 (8th Cir. 1982). I recommend upholding the search despite the incorrect apartment number listed in the warrant. *See United States v. Clement*, 747 F.2d 460, 461 (8th Cir. 1984) (upholding search pursuant to a warrant authorizing the search of a particular person's apartment but listing the wrong apartment number, because the officer who executed the warrant had personal knowledge of the location of the apartment and went straight to the correct apartment when executing the warrant.).

Doc. No. 38 at 8-9. Upon my de novo review, I agree with Judge Mahoney's analysis. This is not the first time that officers have made a mistake with regard to identifying a residence with particularity in a search warrant. *See Thomas*, 263 F.3d at 807 (search warrant issued for 3108 South 62nd Street, Apartment #2 rather than the intended residence of 3202 South 62nd Street, Apartment #22); *United States v. Clement*, 747 F.2d 460, 461 (8th Cir. 1984) (warrant listed the proper building number, but the incorrect apartment number). In *Thomas*, the court found that the warrant did not satisfy

the particularity requirement, but the search was otherwise valid under the good faith exception described in *United States v. Leon*, 468 U.S. 897 (1984). *Thomas*, 263 F.3d at 807. In *Clement*, the court found the mistaken apartment number was of no consequence because the officers executing the search warrant knew which apartment was the target's apartment. *Clement*, 747 F.2d at 461.[1]

Mattson argues the warrant did not particularly describe the place that was actually breached and searched. Doc. No. 41 at 1. Even if true, I agree with Judge Mahoney that *Leon*'s good faith exception would apply. Under *Leon*, "evidence should not be suppressed where police officers rely in reasonable good faith on a properly obtained warrant, that proves to be invalid." *Thomas*, 263 F.3d at 808 (citing *Leon*, 468 U.S. at 906). The *Thomas* court noted that it had extended *Leon* so far as to uphold a search conducted pursuant to a warrant completely lacking a description of the premises to be searched. *Id.* (citing *United States v. Curry*, 911 F.2d 72 (8th Cir. 1990)). If *Leon* applied under the circumstances in *Curry*, it surely applies here, where the warrant contained the correct street address and floor but the wrong apartment number.[2] While

---

[1] The *Clement* court made no findings with regard to the particularity requirement or the good faith exception (although, to be fair, *Leon* was decided only a few months prior to *Clement*).

[2] *Leon* is not applicable in the following four situations:

(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;
(2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;
(3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and
(4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citing *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)). Mattson does not argue that any of these exceptions apply here.

Mattson takes issue with the application of the good faith exception, he fails to state why. He does, however, detail how he believes the circumstances of this case are different from the ones in *Thomas* and *Clement*.

In *Thomas*, officers searched defendant's apartment at 3202 South 62nd Street #22. The warrant listed a prior residence of the defendant – 3108 South 62nd Street #2. *Thomas*, 263 F.3d at 806. The warrant did not describe the place to be searched any further. *Id*. Prior to executing the warrant, the officer who prepared the warrant had been conducting surveillance on the correct apartment. *Id*. The affidavit in support of the search warrant listed the proper address and described the premises to be searched. *Id*. Neither the officer nor the judge who signed the warrant noticed the discrepancy between the affidavit and search warrant. *Id*. at 807. The police searched the intended apartment, which was led by the officer who had obtained the warrant and had personal knowledge of the intended apartment. *Id*. As noted above, the court found that although the warrant did not meet the particularity requirement, the good faith exception applied and did not require suppression of the evidence from the search. *Id*.

In *Clement*, the search warrant described the premises to be searched as apartment number 4 at a particular address. *Clement*, 747 F.2d at 461. Officers executed the search warrant at apartment number 3 at the same address. *Id*. The subject of the warrant was the apartment manager and had previously lived in apartment number 4, but at the time the warrant was issued, lived in the adjacent apartment – number 3. In determining whether to uphold the search, the court noted that an officer had been to the apartment building several times before and knew where the subject's apartment was located. *Id*. The day before the warrant was issued, this officer had spoken with the subject and his girlfriend (who lived in apartment number 3) in their respective apartments. *Id*. The court noted that when officers arrived to execute the warrant, they went straight to the subject's apartment and there was no probability of a mistaken search. *Id*. Therefore, the court held that the inaccurate address in the warrant did not invalidate the search. *Id*.

Mattson argues this case is different from *Thomas* and *Clement* because:

- Mattson has never lived in apartment #2;

- the execution of the warrant and the actual breach of the door to apartment #4 was not conducted by the officer who authored the warrant application. The "HEAT team" (none of the members of which were identified by the Government at the hearing) breached the door and entered;

- the affidavit was not incorporated into the warrant;

- the address in the warrant, although incorrect, did not describe the same piece of property;

- the premises intended to be searched was not adjacent to the premises described and both premises were not under control of Mr. Mattson;

- any surveillance was not conducted by an officer who executed the warrant and, in any event, the surveillance was done from the outside of the complex and there were two apartments in the upstairs.

*See* Doc. No. 41. While these may be factual distinctions, they are not *material* distinctions that affect the outcome of the analysis. In *Thomas* and *Clement*, the fact that the defendant had previously lived at the incorrect address simply explained how the mistake in the warrant occurred. *See Thomas*, 263 F.3d at 806; *Clement*, 747 F.2d at 461. The ultimate holdings in those cases were not dependent on this fact.

With regard to the officers who executed the search warrant, it is true that Timmer, who prepared the search warrant, application and affidavit, was not part of the tactical entry team. *See* Doc. No. 31 at 54. However, Davenport, Winterboer and Ewalt, were all present at the briefing with the tactical entry team prior to the execution of the warrant and both Davenport and Winterboer had personal knowledge of the intended apartment to be searched. *See* Doc. No. 31 at 22, 81; Doc. No. 32 at 12, 15. A photo from that briefing shows that the target apartment discussed at the briefing was number 4, not number 2. Doc. No. 23-8. Therefore, the chance of officers entering the non-targeted

apartment (number 2) was very small, just as it was in *Thomas* and *Clement*. *See Thomas*, 263 F.3d at 809; *Clement*, 747 F.2d at 461.

It is also true that the affidavit was not incorporated into the warrant. However, this was also the case in *Thomas*. Thus, the *Thomas* court noted that the affidavit could not cure the defective warrant. *Thomas*, 263 F.3d at 808. However, this had no effect on the application of the good faith exception. *Id.* at 808-09.

Mattson also states that the address in the warrant, although incorrect, did not describe the same piece of property. In *Clement*, the court stated that among the factors it considers in deciding whether to uphold a search in which the warrant inaccurately describes the place to be searched are: "(1) whether the address in the warrant, although incorrect, still describes the same piece of property; (2) whether the premises intended to be searched are adjacent to those described and are all under the control of the defendant; and (3) whether other parts of the description which are correct limit the place to be searched to one place." *Clement*, 747 F.2d at 461 (citing *Gitcho*, 601 F.2d at 371, *cert denied*, 444 U.S. 871 (1979)). The warrant in this case describes the property to be searched as "the residence located at 215 W 2nd St Apt #2. located on the second floor of the building in Spencer, Iowa, described as a blue two story four unit apartment house and any/all associated garage stalls in Clay County, Iowa in the possession of Travis Wayne Mattson." Doc. No. 23-3 at 1. It is uncontested that the correct apartment (#4) was also on the second floor of a blue two-story, four unit apartment house. While Mattson had no connection to apartment number 2, I find this to be immaterial based on all of the other circumstances that assured the targeted apartment was the one searched. In any event, I find that any mistaken description of the property in the warrant is overcome by the *Leon* good faith exception.

With regard to the location of the intended apartment not being adjacent to the one listed in the warrant and not in the control of Mattson, I find these are also distinctions without a difference. In *Clement*, the warrant listed apartment number 4, but the officers searched apartment number 3. *Clement*, 747 F.2d at 461. The *Clement* court noted this

14

was one factor to consider when deciding whether to uphold a search pursuant to a warrant with a mistaken address. *Id.* Notably, the court in *Clement* concluded that under the facts of that case, "there was no probability of a mistaken search, and we cannot conclude that the inaccurate address in the warrant should operate to invalidate the search." *Id.* The facts in this case establish the same based on multiple officers' familiarity with Mattson's apartment. The adjacency and control elements are immaterial as there was no question at the time of the search which apartment was the intended apartment.

Regarding surveillance of the property, this too is a distinction without a difference. The point the court made in *Thomas* was that all officers had the same apartment in mind when obtaining and executing the search warrant. *Thomas*, 263 F.3d at 809 (noting that danger of searching the incorrect residence was mitigated by the fact that the officer who had personal knowledge of the location to be searched had obtained and executed the warrant and that the intended location was also under surveillance while he secured the warrant). The same concern is mitigated here, although under different circumstances. Timmer testified he obtained Mattson's address (215 West Second Street, Apartment 4) from a previous arrest in 2016. *See* Doc. No. 31 at 29. Other officers who joined in the investigation (Winterboer, Davenport and Ewalt) had personal knowledge of Mattson's residence and there was never any question or confusion about the target location. *See* Doc. No. 31 at 22, 81; Doc. No. 32 at 12, 15.

Based on my de novo review of the record, I find Judge Mahoney's analysis to be consistent with Eighth Circuit case law and agree with her conclusion that the good faith exception applies under the circumstances here. This objection is overruled.

## IV. CONCLUSION

For the reasons set forth herein:

1. I **accept** Judge Mahoney's Report and Recommendation (Doc. No. 38) without modification.

15

2.	Pursuant to Judge Mahoney's recommendation, defendant's motion (Doc. No. 17) to suppress is **denied**.

**IT IS SO ORDERED.**

**DATED** this 4th day of October, 2018.

_____
Leonard T. Strand, Chief Judge